IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PENDANT PROPERTIES, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.: CIV-22-245-GLJ |
| ) | |
| EMC PROPERTY AND CASUALTY ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Plaintiff, Pendant Properties LLC, objects to and responds in opposition to the Motion for Summary Judgement filed by Defendant EMC and respectfully requests this Court to deny the same. This case is rife with genuine issues of material fact. Plaintiff can adduce evidence to show the elements to bring claims for breach of contract, bad faith, and punitive damages. Of note, when addressing some of the Defendant's factual allegations—based on early disclosures and discovery responses, the Scheduling Order (filed October 11, 2022) allows for Discovery until June 13, 2022. Counsel noted on the joint status report that based on their respective schedules and pending cases, the parties would need the full discovery period (through at least June 1, 2023). [ECF No. 10, p. 2]

**BACKGROUND**

This case centers on a historical commercial building owned by Plaintiff, Pendant on Main Street in Ardmore, Oklahoma, and the damage is sustained during an Oklahoma thunderstorm in August 2020 that produced high winds and large hail. The Colston

1

Building, previously known as the Little Building and, before that, the Simpson Building, is a historical building constructed in 1918.[1] At the time of the 2020 storm, the building was ensured by Defendant EMC. Pendant filed a timely claim and on January 28, 2021, EMC dispatched an engineer to inspect the property. The engineer found what he described as some minor hail damage to the roof but blamed it on old hail events. He also found some hail damage to some of the building's HVAC units but opined they could be repaired. The engineer, along with another third-party inspector, wrote an estimate for the damage they deemed caused by the recent wind and hailstorm. The amount was significantly less than Pendant's damages and benefits owned under the policy.

Pendant sued EMC in the state court in Carter County on June 8, 2021. After the resolution of service of process issues with the statutory service agent, the Oklahoma Department of Insurance, the case was removed to this Court on August 31, 2022 [EFC No. 6]. The gist of Plaintiff's suit is that EMC breached the insurance contract, and its duty of good faith and fair dealing, with Pendant because of its bad faith and inadequate investigation into Pendant's claim. EMC refused to pay the amounts due under the insurance policy ignoring evidence of covered loss and damages to massively reduce the amount paid under the claim in reckless disregard for Plaintiff's rights under the insurance contract and Oklahoma law.

**LEGAL STANDARD**

Summary judgment is a means of testing in advance of trial whether the available

---

[1] A brief history can be found here: https://www.oklahomahistory.net/newsletters/TT878.htm.

evidence would permit a reasonable jury to find in favor of the party asserting a claim." *Blocker v. ConocoPhillips Co.,* 378 F. Supp. 3d 1066, 1068 (W.D. Okla. 2019). "[T]he relief contemplated is drastic and the rule should be applied with caution to the end that litigants will have a trial on bona fide disputes." *Ando v. Great Western Sugar Co.,* 475 F.2d 531, 535 (10th Cir. 1973). The moving party must show 'beyond a reasonable doubt that it is entitled to summary judgment.'" *Blocker* at 1068 (quotation and citation omitted). Specifically, the movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To determine whether a genuine dispute exists, this Court must "view the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party." *Blocker* at 1069. Summary judgment is not proper if "the evidence is susceptible of different interpretations or inferences by the trier of fact" or "reasonable people might differ as to its significance." *Id.* at 1072 (citing *Hunt v. Cromartie*, 526 U.S. 541 (1999)); see also *Beaird v. Seagate Tech.,* Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) ("[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

## RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff would show this Court that genuine disputes as to the material facts of this case preclude summary judgment, as follows:

1. Admitted.

2.	Admitted to the extent that it reflects the policy language.

3.	Admitted.

4.	Admitted.

5.	Admitted to the extent that this characterizes Thompson's Report. Denied because Plaintiff disputes the fact as set forth in Additional Facts No. 5-17 below.

6.	Admitted.

7.	Admitted.

8.	Admitted.

9.	Plaintiff admits that this reflected the initial disclosure. Plaintiff also noted that it would supplement its response related to damages when it determined testifying experts or witnesses qualified to give that testimony. *See* EFC No. 14-8, at p. 16 (Response No. 6).

10.	Admitted.

11.	Admitted that Defendant has quoted the Interrogatory response. Plaintiff has and will supplement those responses with the additional testifying expert reports.

12.	Admitted that Defendant has quoted in part the Interrogatory response. Defendant however failed to add Plaintiff's objection and authority to answer fully the contention interrogatory once discovery has been completed, particularly the cross-examination of Defendant and its agents. See EFC No. 14-8, at p. 12 (Response No. 14).

13.	Admitted that Defendant has quoted in part the Interrogatory response. Defendant however failed to add Plaintiff's objection and authority to answer fully the

contention interrogatory once discovery has been completed, particularly the cross-examination of Defendant and its agents. See EFC No. 14-8, at p. 13 (Response No. 15).

14. Plaintiff admits that it produced documents in response to the request reserving the right to supplement once qualified testifying experts had submitted the required reports.

## PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1. The Colston Building is a historical building constructed in 1918, with tenants that included offices, a bank, and a restaurant. Ex. 1, B-Hill Report at Hill 5. [2]

2. Bryan C. Hill, P.E. inspected the Colston Building, on or about July 20, 2022, to evaluate the roofs, exteriors, and interiors and to determine the cause and extent of the reported conditions. If he found damage to be weather related, he was tasked to determine the most likely date the damage occurred, and the reasonable scope of repairs. See Ex. 1, B-Hill Report at Hill 5.

3. Mr. Hill, on his inspection of the building and review of weather data, found that severe winds greater than 58 mph associated with the hail event on August 16, 2020, more likely than not caused physical damage and required the repair or replacement of damaged building components. See Ex. 1, B-Hill Report at pp. Hill 3, ¶1; Hill 8-11 (discussing weather data and research).

4. According to Mr. Hill, the physical damage included "wind-borne debris that

---

[2] Bates numbers cited are internal to the Report.

impacted the west-facing side of the south penthouse and caused a broken window pane, indentations in the window frame and adjacent man door, and mechanical indentations in the cell tower conduit…" *Id.*

5. Mr. Hill found that large "damaging hail up to [two] inches in diameter associated with the reported hail event on August 16, 2020, likely caused significant physical and functional damage to roof coverings and components and required repair or replacement of damaged building components, including: "metal components included spherical indentations in the RTU metal covers, grills, and condenser fins, rigid ducts, metal panel awnings, window frames, appurtenances, aluminum window sill coverings and trims, flashings, drive-through signage cover, and gutter." *Id.* at *¶*2.

6. The functional damage included impact to glazed terra cotta tiles which were fractured and spalled glazing with exposure of the terra cotta. He further opines, "The hail-caused fractures have reduced the value of these building components, shortened the useful life, and create a potential fall hazard to the public below as the terra cotta is exposed and subject to deterioration." *Id.*; and Hill 15-17 (for further discussion and analysis).

7. The storm damage displaced or affected roof components. Mr. Hill found "granule and bitumen cover, exposed bitumen, exposed reinforcement, dented, bruised, and fractured reinforcement mat, and breached condition of the roofs over the penthouses, 6th story and 1-story roofs." *Id.* at Hill 3*, ¶*2; and Hill 15-17 (for further discussion and analysis).

8. The physical evidence Mr. Hill observed and measured at the property "indicated that water migration past the roof had occurred at the Colston Building as a

result of the wind-borne debris penetrations and hail-caused breached roofing systems." *Id.* ¶3.  Mr. Hill found no storm-related damage to the TPO roofing components. *Id.* at Hill 3, ¶4; Hill 15-17 (for further discussion and analysis).

9.  Hill found that the water migration from the damaged roof had caused some interior damage to some top Floor offices requiring "a paint application of the concrete roof deck, replacement of water damaged light fixtures and electrical outlets, replacement of damaged wall and floor coverings, cleaning and or replacement of affected [built-in] cabinetry, and drywall. *Id.* at Hill 19.  Hill found that water damage on the lower floors of the building was unlikely related to water migration from storm damage to the roof. *Id.*

10.  Hill found that the damage from the August 2020 storm required repairs to: "The [fire-rated] window frame and window pane and the man door on the west-facing side of the south penthouse"; "Replacement of the physically damaged rigid ducts, metal panel awnings, heavy gage appurtenances, flashings, fire rated window frames, aluminum window sill coverings and trims, flashings, drive through signage cover, and gutter. A portion of the flashing replacement will require removal and replacement of the marble cladding", and repair or replacement of the HVAC units; Repair or replacement of the hail-caused physically damaged glazed terra cotta tiles (following the "Historic Glazed Architectural Terra-Cotta Preservation Briefs" guidance; and replacement of the structurally damaged bitumen and mod-bit roofing surfaces. *Id.* at Hill 21-22.

11.  Mr. Hill also reviewed Defendant's Engineering Inc. Report (or EI Report). He first disagreed with EI Report's claim that no "wind related damage was found to the exterior of the building." *Id.* at Hill 19. He explains that EI included no wind data in its

7

report and omitted the wind damage to the penthouse or conduit lines. *Id*. at Hill 19.

12. Similarly, he notes that EI references a Core Logic report [ECF 14-3, pg. 32] (but was not attached), and says it may have occurred on August 16, 2020. *Id*. at Hall 19. Hill claims that the hail damage observed was from the August 2020 storm because had it been from old hail events "have had a heavily soiled condition in the indentations." *Id*. at Hill 19. Hill noted too that EI was quick to attribute visible damage to old hail events, quoting an EI line, "…hail related dents were chalked on some of the metal HVAC ducts…but these were older and consistent with the age of the building." *Id*. at Hill 20 (quoting [ECF 14-3, pg. 14]. He noted that the building was more than 100 years old, and that the based on the changes to the building over time (using Google Earth), the hail damage could not have occurred until after February 2016. Id.; and at Hill 14 (discussing the historical imagery, compared with the observable damage). And as noted above, EI's report claims no impacting hail damage occurred between May 2011 and April or August 2020. [ECF 14-3, pg. 32]

13. Hill noted that while EI acknowledged hail-related dents to the north and west aluminum windowsills it ignored the hail-caused damage to the fire-rated window frames on the building that was visible from the first-story roof. *Id*. at Hill 21.

14. Hill again disagreed with EI's Report's statement no storm-related damage was Noted to the glazed terra cotta. *Id*. (quoting [ECF 14-3, pg. 32]. Hill concluded that "based on the condition of the spherical spalled glazing, impact condition, and exposed terra cotta coincident to the impact with slight fungal growth," EI should have seen the damage during its inspection. *Id*. at Hill 21.

15. Hill strongly disagreed with EI's Report finding the only hail damage to the HVAC units on the roof because of the visible damage and contrary evidence. *Id*. at Hill 21. Hill included photographs taken during his inspection. *See id.* at Hill 26-71 (Photos 6-8, hail impacts to roof; Photos 11-12, wind debris damage to the penthouse; Photos 21-57, hail damage-impact to roof; Photos 56-76, hail damage-impacts on awnings, windowsills, and coverings, lower roofing systems; Photos 77-78, visible water stains in the penthouse; Photos 79-90, interior water damage).

16. A public adjuster, Darrell Duane Smith, contracted by Plaintiff, through counsel, estimates that to make the repairs to the Colston Building from the August 2020 storm, including "to the Bitumen roof, Glazed terra cotta tiles, and metal awnings and caused mechanical impact indentations in the cell tower conduit run covers, HVAC system, and interior rooms" at Replacement Costs of $763,049.96, with an Actual Cash Value of $742,034.70 (deducting depreciation). *See* Ex. 2, Smith Report at 2, 26 (using April 2023 Xactimate Pricing). Smith notes that his pricing includes amounts for the Life One Safety Protocol developed by Kevin Dandridge to ensure safety (to the contractors and the public) during the repairs. *Id.* at Smith 1.

17. Kevin Dandridge, with 1 Life Safety, developed a safety protocol for the repairs based on building conditions with OSHA rules, local laws, and public safety because most contractor estimating software does not include those costs. See Ex. 3, Dandridge Report at Dandridge 7. Dandridge's report outlines the safety protocols and equipment if necessary. *See id*.

18. Thomas C. Moore, a consulting meteorologist, hired by Plaintiff, through

counsel, examined five different metrological sources including radar images, National Oceanic and Atmospheric Administration reports, Local Climatological Data, and National Weather Service products to conclude that a severe thunderstorm moved over the Plaintiff's property during the afternoon of August 16, 2020, and produced "severe hail of 1.25" to 1.75" at the Property." See Ex. 4, Excerpt from Moore Report at Moore 5-15.

## ARGUMENT AND AUTHORITY

In determining whether to pay a claim, an insurer must conduct an investigation "reasonably appropriate under the circumstances." *Hayes v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 1291, 1302 (W.D. Okla. 2012) (quoting *Willis v. Midland Risk Ins. Co.*, 42 F.3d 607 (10th Cir. 1994); *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105 (Okla.1991)). "An investigation does not meet this standard if (1) the manner of investigation hints at a sham defense or otherwise suggests that material facts were overlooked, or (2) the insurer intentionally disregarded undisputed facts supporting the insured's claim." *Id*. (quoting *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870 (10th Cir. 2006)).

### I.   EMC BREACHED THE DUTY OF GOOD FAITH AND FAIR DEALING.

An insurance company's breach of the duty of good faith and fair dealing (or "bad faith") is an "independent and intentional tort" in Oklahoma. S*ee McCorkle v. Great Atlantic Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981). The duty of good faith and fair dealing requires the insurer to conduct a thorough and fair investigation, analysis, and evaluation of the insured's claim. *See, e.g. Buzzard* at 1109. "[I]t is essential that an insurer fully inquire into possible bases that might support the insured's claim" before denying it. *Egan*

*v. Mutual of Omaha Ins. Co.*, 620 P.2d 141, 145 (Cal. 1979); *see also Willis* at 613 (citing *State Farm Fire & Case Co. v. Barton*, 897 F.2d 729 (4th Cir. 1990) (evidence that an insurer used its investigation to support the denial of a claim, rather than attempting to learn the truth, will support a jury verdict of bad faith and punitive damages).

Once the insurer has come to a full understanding of the insured's damages, it must place a value on those damages that will fairly and reasonably compensate the insured. "[T]he essence of the intentional tort of bad faith…is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle* at 587 (emphasis added).

### A. EMC's Conduct was Unreasonable.

EMC's investigation was biased to find minimal or old damage (so it could rely on an exclusion), ignoring or refusing to investigate obvious evidence of recent wind and hail damage to Plaintiff's property. In a bad faith claim, "the decisive questions are whether [the insurer's] denial of coverage was based on a good-faith reason at the time it decided to deny coverage, and also whether [it] conducted an investigation reasonably appropriate under the circumstances to determine the validity of [the] claim." *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1127 (10th Cir. 2012). EMC did not satisfy either element, summary judgment is improper.

#### 1. EMC did not conduct an adequate investigation.

EMC's investigation, through EI, was flawed and inadequate. "Oklahoma law imposes on Defendant an obligation to undertake an investigation reasonable under the circumstances before it denies Plaintiff's claim." *Matlock v. Texas Life Ins. Co.*, 404 F. Supp. 2d 1307, 1314 (W.D. Okla. 2005). "An inadequate investigation by the insurance company may give rise to an inference of bad faith, requiring the question to be determined by a jury." *Hall v. Globe Life Ins. Co.*, 968 P.2d 1263, 1265 (Okla. Civ. App. 1998) (citing *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431 (10th Cir. 1993)), *see also Crews v. Shelter Ins. Co.*, 393 F. Supp. 2d 1170, 1177 (W.D. Okla. 2005) ("If the insurer fails to conduct an adequate investigation of a claim, its belief that the claim is insufficient may not be reasonable.") (quoting *Willis*, *supra*.)

"When a plaintiff bases a bad faith claim on an inadequate investigation theory, 'the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information.'" *Sellman v. AMEX Assur. Co.*, 274 Fed. Appx. 655, 658 (10th Cir. 2008) (quoting *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335 (10th Cir. 1995)). There is sweeping evidence that EMC, through EI, conducted a cursory investigation aimed at paying a minimal amount under the policy. EMC cherry-picked the evidence it cited in its report to claim no evidence of impactive hail damage but ignored evidence of recent damage. *See* Additional Facts No. 11-15.

EMC ignored the damage to the penthouse level structure, ignored visible damage to the fire-rated window frames from the first-floor roof, ignored evidence of water migration to the interior of the building, did not address wind debris damage (and data). *See id.* From this evidence, a reasonable juror could find that EMC conducted a biased

investigation to avoid paying Plaintiff all the damages owed under the policy. There is no evidence that EMC inquired into all possible bases that might support the Plaintiff's claim when it ignored obvious evidence of recent hail damage to the roof, and water migration from that roof damage, and wind debris and other damage to the property. EMC concedes that hail occurring during the policy period caused damage to the HVAC units *on the roof*, but no other damage.

> 2. <u>EMC did not have a justifiable basis for denying Plaintiff's full claim</u>.

An insurer "does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage…and the insurer's position is 'reasonable and legitimate.'" *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760 (Okla. 1984)). However, this "will not act as an impenetrable shield against a valid claim of bad faith" where the alleged "dispute" arises from a wholly inadequate investigation. *See id*. Any argument from EMC that there is a "legitimate dispute" to the reasonableness of its investigation must be rejected. Failure to investigate material facts or essential elements of claim (or reasons for denial) will not give rise to a legitimate dispute. *See* C*rews v. Shelter General Insurance Company,* 393 F.Supp.2d 1170, 1178 (W.D. Okla. 2005*)*; *Watson vs. Farmers Insurance Company, Inc.,* 23 F.Supp.3d 1342, (N.D. Okla., 2014). EMC lacked a reasonable basis for denying Plaintiff the full amounts due under the policy for the August 2020 storm.

**B.    EMC Breached the Contract.**

By not paying Plaintiff the full amounts due under the policy for the August 2020

storm, EMC breached the contract. Even assuming, without agreeing, a jury could find EMC acted reasonably, Plaintiff is not foreclosed from seeking its contractual damages under the policy. *See e.g. Oulds v. Principal Mutual Life Insurance*, 6 F.3d 1431 (10th Cir. Okla. 1993).

## II.     PUNITIVE DAMAGES ARE WARRANTED.

Punitive damages are available under Oklahoma law where, as here, "there is competent evidence of a reckless disregard by the defendant of the plaintiff's rights from which malice and evil intent may be inferred." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1106 (Okla. 2005). "One acts with reckless disregard if he was either aware, or did not care, that there was a substantial and unnecessary risk that his conduct would cause serious injury to others…" *Therrien v. Target Corp.*, 617 F.3d 1242, 1259 (10th Cir. 2010) (quotations and citations omitted).

"[P]unitive damages, like compensatory damages, do not stand alone as a separate cause of action; they constitute an element of damage subject to proof in connection with [Plaintiff's] negligence claim." *Deela v. Annett Holdings, Inc.*, 2019 WL 55580095 at *2 (E.D. Okla. 2019) (citing *Nelson v. Am. Hometown Publ'g, Inc.*, 333 P.3d 962 (Okla. Civ. App. 2014)) (internal quotations and alterations omitted). "[T]here is little danger of prejudice in waiting for the facts to be presented to the jury. A decision regarding a punitive damages instruction can be made at that time." *Id*. (quoting *Longoria v. Khachatryan*, 2016 WL 5372831 (N.D. Okla. Sept. 26, 2016)). "[P]roof for punitive damages will probably overlap with that of the underlying cause of action." *See Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1247-1248 (Okla. 1993).

## **CONCLUSION**

    Because Plaintiff has established the elements to bring claims for breach of contract, the tort of insurance bad faith, and punitive damages, and because many genuine issues of material fact are in dispute, Plaintiff respectfully requests that EMC's Motion for Summary Judgment be denied in its entirety.

Respectfully submitted,

*/s/*Terry M. McKeever
Terry M. McKeever, OBA #21751
FOSHEE & YAFFE LAW FIRM
tmm@fylaw.com
P.O. Box 890420
Oklahoma City, OK 73189
Telephone:   (405) 632-6668
Facsimile:   (405) 632-3036
*Attorneys for Pendant Properties*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of April 2023, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants and/or in accordance with the Federal Rules of Civil Procedure:

Phil R. Richards, OBA # 10457
Matthew R. Watson, OBA #34580
RICHARDS & CONNOR
12111 Floor, ParkCentre Bldg.
525 S. Main Street
Tulsa, Oklahoma 74103
*Attorneys for Defendant*

                                          *s/*Terry M. McKeever
                                          Terry M. McKeever